By the Court,

Potter, J.
The complaint of the plaintiff
is on the ground that the defendants had not probable cause for the arrest and detention. Only two points are necessary to be considered, in the case. First. May an arrest be made on probable cause ? And, second ; had the defendants probable cause to make the arrest in this case, and to detain the plaintiff on süch arrest? We may, at this stage of the examination, clear the case of two questions that sometimes are mingled with or have influence upon the facts of the case, and which are often controlling of its result's, to wit, actual malice, and knowledge of the plaintiff’s innocence by the-defendants. The plaintiff was an entire stranger to the defendants, and therefore neither of these questions can be presumed against the defendants. PTo malice was claimed. This- question was not controverted. This relieves the case of much of the embarrassment, which those questions, as facts, sometimes present; for it sometimes happens that the sam.e act, done by the same person, proceeding from an evil or bad motive, is actionable, which would not be so actionable, if proceeding from the honest intent to discharge a public duty.
1. The question of probable cause, in actions for false •imprisonment, has been a question that has been settled as an important one by the common law, from time , immemorial. The absence of probable cause was always alleged *493 in the declaration. (2 Chitty on Pl. 376, 377.) It was a necessary allegation, vurcfiq —• aim<ek Xi^&r ctu fynefoc
An important distinction is recognized in this class of"' cases, both in the English courts and in our own; and which distinction may determine this case, and should be stated here, so that it may be kept in view throughout'the discussion. It is the distinction between an arrest made by, or at the instance of, a private person; and pne made by magistrates and other police or public officers, where the defense pleaded is probable cause for the arrest. This distinction has never been questioned as existing in the law, though counsel do not always remember, or appreciate it. In the case of Samuel v. Payne, (Doug. R. 358,) tried before Lord Mansfield, he held “that a peace officer may justify an 'arrest, on a reasonable charge of felony, without a warrant, although it should afterwards appear that no felony had been committed; but a private" individual cannot;” and his lordship remarked, that this would be a most mischievous rule, applied to an officer; and after-wards, upon a rule to show cause, he held that the constable and his assistants were justified. One Payne, a private individual, gave the information to the constable upon which the arrest was made. Payne and the constable, and his two assistants, were all sued.in an action for false imprisonment. On a new -trial granted, Lord Mansfield again presided, and upon his charge a verdict was taken against Payne, and in favor of the constable and his assistants. To sustain this rule, a case was cited from the Year Book (7 Hen. IV, p. 33, pl. 3.) This rule and distinction was also recognized in Hopkins v. Crowe, (7 Car. P. 371,) and in West v. Baxendale, (67 Eng. Com. L. 141.) In our own court, in the case of Holley v. Mix, (3 Wend. 350, 353,) Ch. J. Savage laid down the rule thus: “If an innocent person is arrested- upon suspicion, by a private individual, such individual is excused, if a felony was in fact committed, and there was reasonable ground to sus *494 pect the person arrested. But if no felony was committed by any one, and a private individual arrest, without warrant, such arrest is illegal, though an officer would be justified if-he acted upon information from another which he had reason to rely on,” citing Chitty on Cr. Law, 15, and 3 Camp. 420. The same distinction is also repeated in Brown v. Chadsey, in the opinion of Emott, J., (39 Barb. |262, 263.)
We. proceed, then, to the examination of the point,-were the provost marshal and his deputy such officers as by law possessed the power to arrest the.plaintiff on probable cause appearing to them for believing that he was a deserter?
By the 5th section of the. act of congress, entitled “ An act for the enrolling and calling out the national forces, and for other purposes,” passed March 3, 1863, “ all able bodied citizens between the ages of twenty and forty-five (with certain exceptions) were declared to constitute the national forces.” Section 4 provided for the appointment in every congressional district, of one provost marshal, who should be subject to the orders of the provost marshal general, whose office should form a separate bureau of the war department. By section 6, it was made the duty of the provost' marshal general, with the approval of the secretary of war, to make rules and regulations for the government of his subordinates. By section 7, it was made the duty of the provost marshals to arrest all deserters, whether regulars, volunteers, militiamen or persons called into service under that or any other act of congress, wherever they might be found, and to send them to the nearest military commander, or military post; and to obey all lawful orders and regulations of the provost marshal general,” &c. The preamble of this act recited, as a reason for its passage, the existence of a state of insurrection" and rebellion, and the necessity of a military force, &c. Without this preamble, the courts' could take judicial notice of those matters. . This act expressly made it the *495 duty of provost marshals to arrest deserters. He. was therefore a public officer; his duties concerned the public, and were connected with the administration and execution of justice; he was an executive officer. His office bore the same relation, in some respects, to the military courts, that sheriffs, marshals, constables and peace officers do to the civil courts. His acts performed by authority of law, are by <£ due process of law,” within the meaning of the 6th article of the amendments to the "United States constitution. (Murray’s Lessees v. Hoboken Land Imp. Co., 18 How. U. S. R. 272.) There can be no difference in the powers of the same character of offices, whether performing their duties under the general or the State goverments; the common law prevails in both.
It being the duty of the provost marshal to arrest deserters, when may he arrest them V Must he wait until, by trial and sentence, they have been adjudged and convicted, of desertion ? Who then would be arrested, if trial is to precede the arrest ? When would public officers be found to arrest, if at the peril of an action of false imprisonment in all cases where an acquittal .follows ? The proposition is absurd. The law has been otherwise settled for hundreds of years. Hale, in his Pleas of the Crown, (vol. 2, p. 85,) says: <£ There are certain officers and ministers of public justice, that (virtute officii,’ are empowered by law to arrest felons, or those suspected of felony, and that before conviction or indictment; and these are under a greater protection of the law in execution of their office; 1st, because they are persons more eminently trusted by the law; 2d, because they are by law punishable if they neglect their duty in it.” And he adds, ££ that they should have the greatest protection and encouragement in the due execution of their office. If persons that are pursued" by these officers for felony, or for just suspicion thereof; nay, for breach of the peace, or suspicion thereof, such as night walkers, and persons unduly armed, shall not" yield *496 themselves to these officers, but shall either resist or fly, before they are apprehended, or being apprehended, shall rescue themselves, and resist or fly, so that they cannot be otherwise apprehended, and are upon necessity-slain therein because they cannot be otherwise taken, it is no felony in these officers or their assistants, though possibly .the parties killed are innocent.” “ The officers I here intend, are justices of-the peace, sheriffs, coroners, constables and watchmen, and when I mention these, I also include all that come in their aid and assistance, for. every man in such cases is bound to be aiding and assisting to these officers upon their charge and summons in preserving the peace, and apprehending malefactors,. especially felons.” (See also East’s P. C. 301; Roscoe’s Crim. Ev. 743; 1 Hill, 170 and authorities, supra; Wood v. United States, 16 Peters, 342.) Such authority and power has never been , questioned, and its exercise is a commendable duty. How, otherwise, in a state of war, insurrection or rebellion, could • the rules of war and discipline of the army be maintained by the government ? How, in. the great cities of the land, could police power' be .exercised, if every peace officer is liable to a civil action for false imprisonment, if persons arrested upon probable- cause shall afterwards be found innocent? Police authority would be a sham,' its officers be made cowards, and government become a failure..
2d. The next question in order presented, is, had the defendants probable cause to arrest the plaintiff as a deserter ? •
. Let us look at undisputed facts. There was then a state of rebellion existing in the country. The plaintiff had resided at Canajoharie, Montgomery county, but had been absent frdm there* several years. He returned about August, 1863. He -had been seen wearing a portion of soldiers’ uniform. By a law of congress, the clothes, arms, military outfits and accoutrements' furnished by the United States to any soldier were forbidden to be sold, bartered, ex *497 changed, pledged, loaned, or given away; and no person, not a soldier, who had possession • of such clothes, &c., should have any right, or interest therein. Any officer, civil or military of the United States, had the right to seize them, and the possession of them by any person, not a soldier or officer of the United States, should be prima facie evidence of a violation of this law. Both these defendants had been informed by a government officer, that this long absentee had returned, and was in possession of government clothes, and was believed to be a deserter. All these circumstances appeared before any pretended arrest was made. The plaintiff was then seen by the deputy, Marcellus, at the railroad depot in Schenectady, within a few rods of the provost marshal’s office, and was invited to go there—arrested probably. When questioned he denied having been in the service; he denied having any soldier’s uniform. .Upon further examination he admitted having a uniform, and then attempted to explain how he came in the possession of it, viz : that he was in California; that Massachusetts was raising a regiment there; that he desired to come home, and they promised to make him a hospital steward, if he enlisted; that they gave him transportation, and subsistence to Boston, and there gave him the uniform; that he was cheated out of the place of hospital steward; that he left; that he had never been mustered into the United States service, and that he brought away his uniform. Taking this statement with its plain contradictions of his first statement with the'. admitted facts of being transported, subsisted and clothed by government, and unlawfully wearing away their uniform, and denying its possession, are the facts upon which the provost marshal acted. If any one could be found, in that day of desertions and bounty jumping, (which are matters of notorious history, and of which we may take judicial notice,) incredulous, or verdant enough, to believe in the truth or integrity of a story thus detailed, a part of *498 which was known to he false, he would have been a most unfit person to perform the executive duties of provost marshal. Although, remarkable it is, as it turned out, the story of his never having been mustered into the service-was true; but the felony of taking the government’s clothing was fixed upon Mm. The falsehood as to the clothing, rendered more than suspicious the denial of being a deserter. It is not necessary to demonstrate further, that this statement presented probable cause to believe the plaintiff was a deserter. The question, whether the defendants had -probable cause for the arrest upon undisputed facts, is a question for the court, not for the jury. (West v. Baxendale, 9 Com. B. 141. Sutton v. Johnstone, 1 Term R. 507, 545, per Eyre, Baron.) Per Lord Mansfield: “If the facts are in conflict, the jury must-find the facts, and when found, it is a question of law, whether they amount to probable cause.'” (Id.) There is no conflict here, on, the trial, as to any material fact in this case. The plaintiff's evidence in this respect agrees with that of the defendants. Ho point was raised or made on the trial that the arrest was made with motives of malice or oppression. The defendants were public officers. They had public duties to discharge. They were called to act in perilous, arduous and difficult times. They were invested with legal authority to act." The law of the country imposed upon them a public duty, for public purposes. They were punishable for neglect of duty, if they neglected to act in a case where there was sufficient or probable cause for acting. The safety of the government, and the discipline of the army, depended -upon- their fidelity, and the country was materially interested in their conduct. It was the duty of the court, in such a case, unflinchingly to come up to the standard of duty, and pass upon the questions that had been committed 'to, and appropriately belonged to them. It would be a reproach to a court, under such circumstances, if through timidity or a desire to shirk re *499 sponsibility, they should leave to the jury a question which, by the theory of our law, they are incompetent to try, to wit, whether probable cause for arrest had been shown: It is not only proper for the court, but by the wisdom of the sages of the law the courts are directed to give great latitude in the review of the acts of such officers. In the case of Wall v. McNamara, tried by Lord Mansfield, sitting at Westminster, in Michaelmas term, 1779, he said; “In trying the legality of acts done by military officers in the exercise of their duty, great latitude ought to be allowed; and they ought not to suffer for a slip of form, if their intention appears by the evidence to have been upright; it is the same as when complaints are brought against inferior civil magistrates, as justices of the peace, for acts done by them in the exercise of their civil duty. The principal inquiry to be made by a court of justice is, how the heart stood ? and if there appears to be nothing wrong there, great latitude will be allowed for misapprehension or mistakes.” See also the sensible remarks of Rosekrans, J., in Colton v. Beardsley, (38 Barb. 29 and 45,) and cases cited by him.
This disposes of all I propose to say upon the acts of the defendants in making the arrest in question; and as to their having probable cause. I think the arrest was fully justified by the probable cause shown.
But another question is raised : that though the arrest itself might be justified, yet the period of imprisonment was unreasonable and unlawful; that on this ground the plaintiff is entitled to recover; and that this question has in fact been adjudicated. I am not wanting in respect to the opinions of a co-ordinate branch of this court; nor to the wisdom, integrity or patriotism of the learned jurist whose opinion has been cited to this point of the case. It is not at all certain that the facts in the case before us are identical with the case submitted to .the court in the third district. I think, indeed, they cannot be entirely the same;- *500 and this difference would doubtless have produced the difference in the result there. Indeed the statement of facts, as contained in the opinion of the learned judge in that case, presents a clear difference. He says, “ it does not appear that he (plaintiff) was kept in custody temporarily, with a view of being sent, as the law provides, to the time he was brought -up to be sent to Hew York; nor that the length of time that he was thus kept in custody was'necessary or proper, prior to his being taken to. the proper place.” With no certainty on this question of identity of cases, we must proceed to examine this point upon the facts before us, and apply the law as we understand it, to the case as it appears now. Whether the defendent was detained an unreasonable period of time in the lock-up at Schenectady, instead of being'locked up elsewhere for a like or- longer period, depends as much upon the requests of the plaintiff, which may estop him from complaining, and upon that and other facts which justify the defendants’ action, as it does upon the interpretation of a statute which creates a liability by technical construction; or by judicial legislation in adding words to a statute not contained in it, against a public officer, whose duty it is to exercise,.in a given case, his best judgment.
I do not however concur in the proposition contained in the adjudicated case, that assuming the arrest to have been authorized and justified, the burthen of proof was upon the defendants, when sued for false imprisonment, to show that the four days the plaintiff" was imprisoned, was necessary and proper.
The seventh section of the act of congress (Laws of the United States, 1863, ch. 75) provides “ that it shall be the duty of the provost marshals to arrest all deserters, whether regulars, volunteers, militiamen or persons called into service under this or any other act of congress, wherever they may be found, and -to send them to the nearest military commander or military post.” This is the whole of *501 the duty of the provost marshal that is prescribed by law. Like all other statutes, it is to be reasonably construed. The statute is entirely silent as to the time within which the, deserter shall be sent to the military post. The officer is bound to send him within some reasonable period. This reasonable period is generally a question of\ fact, dependent upon the exigencies of the case. If a de# serter should be arrested every hour, and the nearest military post, as in this case, was 170 miles distant, it 'would be unreasonable that a file of men should be dispatched with each prisoner; especially so, if the enrolling board were engaged in preparing for or making a draft, or otherwise greatly pressed with duties. ¡Not so, if the military post was in the same place. If the arrests would equal one per day, it might be deemed reasonable to dispatch them whenver five prisoners were collected; and if the arrests were still less, reason would dictate that the. expense of the guard to be kept for that purpose, and the distance to be traveled to the military post, should be taken into consideration; and tri-monthly might be not deemed an unreasonable delay. At all events (I speak with due deference to published opinions) it is not a question of law, that without reference to the pressing duties, and the demands upon the time of public officers, and their necessary attention to other business of the public, four days is such an unreasonable detention that the officer was guilty of violating the language of a silent statute, and thus became liable for false imprisonment. Nor do I subscribe to the law, or the reason, of the proposition, “ that if an officer has power to detain a prisoner for a few days, then he had the legal power to do so for a week, a month or a longer period.” Would that learned court be willing to run this line the other way, and hold it to be good law? to wit: “If the officer had no power to detain the prisoner a few days, he had not the power to detain him one day, one hour or one minute.” The proposition *502 is as sound to run one way as the other. The proposition is a ufelo de se.” ■ At all events, I do not subscribe to its ■ soundness. .
The evidence shows that at the time of the plaintiff’s arrest, the provost marshal’s office, in the language of the prisoner, “ Was crowded with people connected with the draft; there was an immense amount of business.” They had three prisoners then in the lock-up, for desertion, besides the plaintiff; the fourth day from Hawley’s arrest "they, including Hawley, were to be sent to the military post. The plaintiff requested to be permitted to remain. His request was granted. He was permitted to remain, and the others sent off*. It might have been a question of fact, perhaps, for a jury, to say whether, under such circumstances, the detention was unreasonable. Sure I. am it was no violation of a statute, as was held. I am equally sure that we are at liberty to act upon our own judgment as to this question. In the case before us there was no request to go to the jury upon the unreasonableness of the detention; but it is seen that from the manner of conducting the trial, and from ■ the argument and brief here, that the plaintiff relied, first, uppn the want of probable cause; second, upon the innocence of the plaintiff of the charge; third, upon the law that- the defendants had violated the statute; and fourth, upon the errors of the judge on the trial. T
But there is another ground upon which I think the defendants are legally excused for the detention, if it does not completely estop the plaintiff from bringing the action. On the day of his arrest and examination in the provost marshal’s office, he had- stated that he was not on any rolls in Massachusetts; he had on that day retained Mr. Mitchell as his counsel, who was with him at the office. When Mr. Mitchell was there, the defendant Butler said something in the presence of the plaintiff, about writing to Boston. On that same afternoon, Butler, by his clerk, *503 wrote to the adjutant-general of Massachusetts. The plaintiff himself testifies that Mr. Mitchell also asked permission to write or telegraph to the Governor of Massachusetts. He was arrested on Monday or Tuesday, and was kept until Saturday; on Saturday the sheriff brought him a letter from the Governor of Massachusetts; he sent the letter to Mr. Mitchell; Mr. Mitchell took it to Captain Butler, who on the same day discharged the plaintiff. It seems the plaintiff -was taken to the office on a day before he was finally discharged, and there, he says: “I told Captain Butler I would like to remain, to hear from the Governor of Massachusetts.” This was the day before he was discharged, His request was again granted. The plaintiff further testified that Mr. Mitchell telegraphed to the Governor of Massachusetts, “and I paid the expense.” Is it not to be implied from this desire to have Butler write, and, by his counsel, telegraphing to Massachusetts, that plaintiff' desired to stay where he was, until he could hear from Massachusetts, rather than be sent 170 miles to a military post, and there stand the chances of still longer delay in imprisonment. He says: “ I told Captain Butler I didn’t want to be marched through the streets of Albany, Hew York and Schenectady, as a deserter, and he sent me back to jail.” This was at the time when he was about to be sent away with the other deserters. This feature could not have appeared in the case before the court of the other district; for they put their decision, somewhat strongly, upon the ground of too long detention at Schenectady. They would not have done this had it appeared that he was detained there at his own request. It is true, the opinion of that court is somewhat emphatic on the subject of the plaintiff’s being detained, while he was protesting his innocence; and that, as it turned out, he was entirely guiltless. “In so doing,” the court say, “they acted in violation of the statute, and exceeded their authority.” It must be conceded, I think,-' as was claimed *504 on the argument, that this was one of the cases of arbitrary arrests, too common during the late rebellion; and .it is not singular that the person arrested, not being a deserter, protested his innocence in that particular; but a,, public officer Cannot in all cases accept of that as a defense. The guiltiest of felons have made the same protest. It is a safer rule, however, for courts to follow in such cases, to decide whether probable, cause is, or is not, shown, than to rely upon the protestations of innocence of the persons arrested. I-have never learned, before, that such protestations created a liability upon the arresting officer. And where there .is probable cause, whether it appear from extrinsic circumstances, or from the conduct, falsehoods or contradictions of the party arrested, the officer acting without malice or bad motive, will be protected, if acting in the line of his duty; and we have already shown that the unreasonableness of the time of detention is a distinct question from that of the first arrest, if the arrest itself can he justified.
[Warren General Term,
July 14, 1868.
Upon the whole view of the case, therefore, we think probable cause for the arrest was shown, and there being no conflict in the evidence.showing that the plaintiff requested the defendant to hold him in the lock-up, instead of sending him to the military post, until word could be obtained from Massachusetts, and that as soon as,such word was received, in pursuance of such request, that the plaintiff was never mustered into the service, the defendant did discharge him, is a sufficient defense to the charge of unreasonable detention. The nonsuit was properly granted, and the judgment should be affirmed.
James, Rosekrans, Potter and Bockes, Justices.]